In re [SWINE FLU IMMUNIZATION] PRODUCTS LIABILITY LITIGATION.

Jennie ALVAREZ, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 78–F–1128.

United States District Court, D. Colorado.

July 31, 1980.

Joseph J. Branney and Neil Hillyard, Englewood, Colo., and Clifford J. Shoemaker, Arlington, Va., for plaintiff.

Joseph Dolan, U. S. Atty., Denver, Colo., Jeffrey Axelrad, Director, Torts Branch, Civ. Div., U. S. Dept. of Justice, Kathryn Richman and William C. Danks, Asst. U. S. Attys., Denver, Colo., and W. Russell Welsh, Trial Atty., Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge:

### BACKGROUND AND OVERVIEW OF THE CASE

On October 28, 1976, plaintiff Jennie Alvarez, age sixty–three and a resident of a small farming community near Greeley, Colorado, received a swine flu vaccination administered pursuant to the National Influenza Immunization Program of 1976. The program was designed to inoculate the country's adult population against the threat of a swine flu epidemic. Plaintiff became seriously ill in late May, 1977–seven months after her swine flu vaccination. She was hospitalized and diagnosed as having a serious neurologic disorder known as Guillain–Barre Syndrome (GBS). At the time of trial, plaintiff was paralyzed in her lower extremities and confined to a wheelchair.

In this suit, brought under the Federal Tort Claims Act,[1] 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, it is claimed that the United States is liable to Mrs. Alvarez for her condition. The United States admits that plaintiff suffers from GBS but contends that there is no causal connection between the vaccination and her illness. The question presented is whether the GBS suffered by plaintiff was caused by the vaccination. We answer the question in the negative and find in favor of defendant, United States of America.

### I.

### PRETRIAL MATTERS

#### THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

The action was filed on October 27, 1978. On February 8, 1979, it was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. The case was thereafter remanded to this Court on December 21, 1979. The Final Pretrial Order of the transferee court provides that where the United States stipulates that a plaintiff has developed GBS at any time after receiving the swine flu vaccination, no theory of liability need be established in order to recover damages. However, causation between the flu vaccination and injury must be proven. *See,* Stipulation and Final Pretrial Order, Paragraph IX, *In Re Swine Flu Immunization Products Liability Litigation,* 464 F.Supp. 949 (D.D.C.1979).

The Final Pretrial Order also limits the litigants to local discovery as distinguished from national discovery. Over seventy depositions were taken during the course of national discovery, several of which were introduced in evidence in this case.

We held a supplemental pretrial conference on May 1, 1980, at which time the parties stipulated that Mrs. Alvarez contracted GBS sometime after being inoculated. Issues of liability and damages were

---

1. The National Influenza Immunization Program of 1976, Public Law 94–380; 42 U.S.C. § 247b (the Swine Flu Act) established the Federal Tort Claims Act (FTCA) as the vehicle for asserting claims arising out of the swine flu program against the United States.

bifurcated. A non–jury trial [2] on the issue of liability followed. This Opinion and Order resolves the liability issue.

The following are the facts established at trial and our conclusions of law. We highlight conflicts in the testimony. A glossary of medical terms used in this Opinion is contained in the Appendix.

## II.

### THE NATIONAL SWINE FLU IMMUNIZATION PROGRAM

The Swine Flu Immunization Program of 1976 was an attempt by the Federal Government to inoculate the entire adult population of the United States against the threat of a swine flu epidemic. It was the largest immunization program in this country's history and over forty–five million Americans–or one–third of the adult population–were vaccinated. The initial vaccinations occurred on October 1, 1976; the program was suspended on December 16, 1976.[3] The program, for which $135 million was initially appropriated by Congress, called for using both private and public health care systems to achieve its goal of inoculating the entire adult population by the end of November, 1976. The November deadline was critical since the season of intense flu transmission in the United States is generally considered to be September through March. *See, The Swine Flu Program: An Unprecedented Venture In Preventive Medicine*, Report to Congress by the Comptroller General of The United States, June 27, 1977.

The Swine Flu Act became law on August 12, 1976 and was applicable to all swine flu inoculations administered after September 30, 1976. Important provisions of the Act include the following:

1. The Act creates a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu inoculation, 42 U.S.C. § 247b(k)(2)(A);

2. it makes that cause of action the exclusive remedy (42 U.S.C. § 247b(k)(3)) and abolishes the cause of action against the vaccine manufacturer; and

3. it makes the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act (42 U.S.C. § 247b(k)).

The program was prompted in part by the medical discovery in early February, 1976 at Fort Dix, New Jersey, of military personnel having a new strain of influenza virus antigenically [4] related to the virus prevalent

---

**2.** Suits under the Federal Tort Claims Act are to be tried without a jury, 28 U.S.C. § 2402. This non–jury provision has been held constitutional, *McElrath v. United States*, 102 U.S. 426, 12 Otto 426, 26 L.Ed. 189 (1880).

Several courts have spoken on issues relating to the Swine Flu program: *Sparks v. Wyeth Laboratories*, 431 F.Supp. 411 (W.D.Okla.1977) *aff'd per curiam*, No. 77–1407 (10th Cir., Dec. 22, 1978) (unpublished opinion) upheld the Swine Flu Act against an argument that it violated the Seventh Amendment. That court stated at 431 F.Supp. 418, ". . . . [I]t is axiomatic that if a cause of action can be abolished [the court had ruled that the abolition of the cause of action against the program participants did not violate due process], the jury trial of that action is also abolished. The elemental fact is that suits against the sovereign were unknown at common law. Thus, perforce, there was no right of jury trial against the sovereign at common law."

The constitutionality of the Swine Flu Act was also upheld in *Jones v. Wyeth Laboratories, Inc.*, 583 F.2d 1070 (8th Cir. 1978), and *Ducharme v. Merrill National Laboratories*, 574 F.2d 1307 (5th Cir. 1978). In *Overton v. United States*, 619 F.2d 1299 (8th Cir. 1980), the court held that in order for funds to be considered collateral to an FTCA damage award, the plaintiff must demonstrate that he has contributed to the fund which he claims as a collateral source. The court upheld the damage award but deducted Medicare payments received by plaintiff.

**3.** *Administration of the National Influenza Immunization Program of 1976*, Final Report to Congress by Department of Health, Education and Welfare (1978).

**4.** It was widely thought by epidemiologists that antigenic shifts in the influenza virus were likely about once every decade. There had been shifts in 1957 and 1968 both followed by pandemics–Asian Flu and Hong Kong Flu respectively–and public health officials were expecting another by 1978 or 1979. Neustadt and Fineberg *The Swine Flu Affair*, published by Department of Health, Education and Welfare, 1978, p. 6.

during the 1918–19 swine flu pandemic. That pandemic was responsible for twenty million deaths worldwide, including 500,000 in the United States alone. Prior to 1930, this strain was the predominant cause of influenza in the United States. Since 1930, the virus had been limited to transmission among swine only with occasional transmission from swine to human and no secondary person–to–person transmission[5].

In addition, the Swine Flu Act was occasioned by the collapse of the commercial liability insurance market, both for vaccine manufacturers and other program participants. The cases of *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968), and *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir. 1974), which held a manufacturer of polio vaccine strictly liable in tort, greatly contributed to the insurance problem. For this reason, the Swine Flu Act provided that the exclusive remedy for injury caused by the vaccine would be against the United States.[6] However, since the manufacturers could still insure themselves against negligence liability, they may be liable in a suit by the United States (42 U.S.C. § 247b(k)(7)) if the United States is found liable on a negligence theory.

History has demonstrated that no swine flu epidemic occurred during the winter of 1976–77. As can be expected, many people who were inoculated also incurred some type of illness, injury or adverse medical condition in a period relative to the vaccination. Lawsuits[7], such as the instant one, were filed throughout the country for illnesses allegedly resulting from the immunization. In addition, numerous administrative claims have been filed.[8] The critical question presented in these cases is the causal relationship between the immunization and the claimed illness. However, mere temporal relation between the onset of a disease and the vaccination is insufficient to establish legal causation. In the case of GBS, the government has stipulated that the swine flu vaccine can cause GBS in some instances. This does not relieve a plaintiff of the burden of proving the swine flu vaccination was the proximate cause of a claimed injury or medical condition.[9]

### III.

### PLAINTIFF'S MEDICAL HISTORY

It is undisputed that plaintiff presently suffers from GBS, and that this condition surfaced sometime after she received the swine flu vaccination. The precise date when her symptoms were first manifested is contested, and the chronology of events during the period from October 28, 1976 to May 31, 1977 is in dispute. There is some degree of conflict between plaintiff's recollection of the facts during that period and recitals contained in her medical records.

Mrs. Alvarez testified that she had worked at various full time jobs from 1948 until her retirement in 1975. Her last position was in the house cleaning service of the County Hospital. She retired because her husband, who also worked at the hospital, retired. Mr. Alvarez was the plaintiff's only source of transportation since she has never driven.

---

5. *Id.*, at 147.

6. The insurers contended that it is the cost of investigating and litigating frivolous suits that prevent them from insuring against strict liability in tort. *Id.*, 58–59.

7. Over one hundred fifty cases have been filed in the judicial districts comprising the Tenth Circuit, *i. e.*, Colorado, Wyoming, New Mexico, Utah, Kansas and Oklahoma.

8. Typically, under the FTCA, before bringing suit a claimant must have first presented his claim to the appropriate Federal agency and the claim must either be denied or receive no final disposition by the agency, 28 U.S.C. § 2675(a). However, under the Swine Flu Act (42 U.S.C. § 247b(k)(2)(A)(iii)) if an action is brought within two years of the date of vaccination and is dismissed because the plaintiff did not file an administrative claim, the plaintiff has thirty days from the date of dismissal or two years from the date the claim arose, whichever is later, in which to bring the claim.

9. 28 U.S.C. § 1346(b) provides that the United States shall be liable to the same extent as a private person would be under the laws of the place where the act or omission occurred. Therefore, Colorado law respecting causation is the proper yardstick in this litigation.

Prior to October 1976, plaintiff had a history of various ailments. She suffered from osteoarthritis in the neck and shoulders with occasional pains in the lower back and hips. The arthritis dates from 1968. In April 1976, Mrs. Alvarez was hospitalized for eight days with severe arthritic pains in her neck and shoulders. Her treating physician, Robert Porter, M.D., testified that in addition to upper body pains, plaintiff also complained of tenderness in her knees. That he did not consider this significant is documented by the fact that no x–rays of plaintiff's knees were taken even though Dr. Porter had extensive x–rays taken of her upper body. The x–rays supported Dr. Porter's diagnosis of mild to moderate osteoarthritis in the neck and shoulders and mild osteoarthritis of the lower back and hips. The medical history (Plaintiff's Exh. 1) taken at that hospitalization indicates that Mrs. Alvarez "had arthritis all over and could hardly get around and that she walked with a marked stoop and very slowly because of the pain and discomfort."

Mrs. Alvarez's medical history also reveals chronic stomach problems including ulcers, gastritis, colitis and diverticulosis. In April 1975, she was admitted to the hospital for treatment of acute diverticulitis. Her history taken at that admission indicates that Mrs. Alvarez was hospitalized twice in 1974 with ulcer problems. It should be noted that in October, 1975, Dr. Porter described Mrs. Alvarez's arthritis as very mild; by April, 1976, it had progressed to a moderate state. In both October 1975 and April 1976, Dr. Porter diagnosed plaintiff as suffering from nervous exhaustion.

Mrs. Alvarez testified at trial that subsequent to her retirement and prior to her swine flu vaccination she had been extremely active and in good health. Her primary activities were attending church and senior citizens' functions and maintaining her house. Mrs. Alvarez has eleven children and frequently prepared dinner for them during that period. In the spring of 1976, after her hospitalization for arthritis, plaintiff planted a garden which was approximately thirty feet by forty feet and contained ten different vegetables. In the summer of 1976, Mrs. Alvarez painted her kitchen and installed tiles on her bathroom floor. In contrast, she testified that in the spring of 1977 she was only able to plant a much smaller garden and constantly required help from her husband to get up from a kneeling position. The details of these activities were supported by the testimony of her daughters and by a neighbor.

Approximately three weeks after receiving the swine flu vaccination, Mrs. Alvarez began complaining of generalized debility, lack of energy, and shooting pains in her shoulders, elbows, wrists and knees. It is one of plaintiff's contentions that these symptoms marked the onset of a mild GBS which smoldered until May, 1977 when the gastroenteritis triggered the syndrome into its acute phase. The government in response, asserts that plaintiff's weakness and aches during this period were attributed to her chronic arthritis. Mrs. Alvarez further testified that in 1976, she was unable to cook Thanksgiving dinner. While she prepared and served Christmas dinner at her home that year, she asked everyone to leave early because she was fatigued. To conserve her energy, instead of her usual Christmas tree, Mrs. Alvarez decorated a smaller plant. This was a departure from past holiday seasons when plaintiff was the focal point of her family's celebrations. Testimony also reflected that Mrs. Alvarez did not possess the vigor necessary to maintain her house as she had in the past. She often found it necessary to lie down and rest in the middle of the day. She also altered her religious practices because she was no longer strong enough to raise herself from a kneeling position. This fact indicates a weakness of the proximal muscles and is vital to one medical opinion that the onset of GBS was approximately three weeks after the swine flu vaccination. The government on the other hand, presented testimony that the inability to stoop is related to an impairment of the sacroiliac and that the x–rays taken in April, 1976 indicate some damage to that joint.

The only specific testimony elicited concerning the period from Christmas 1976

through late May, 1977 related to Mrs. Alvarez's inability to kneel at church and to plant fully her garden. Plaintiff did not see a physician between the time she received her swine flu vaccination on October 28, 1976, and May 31, 1977, when she was admitted to the hospital. Therefore, there are no medical records to substantiate Mrs. Alvarez's complaints of weakness. The government contends that this failure to consult a physician indicates that plaintiff's symptoms were very minor since she visited a physician on the average of ten times a year during the period between 1969 and 1975. The Court attributes those visits to the fact that she worked at the hospital during that period and had ready access to the medical staff.

Dr. Porter's hospital admission record taken on May 31, 1977, and discharge summary dated July 12, 1977, (Plaintiff's Exh. 1) indicate that Mrs. Alvarez's symptoms did not begin until the week before her admission to the hospital although she stated she may have felt a little "all in" during the winter. The noted words were the subject of considerable comment during the trial. Mrs. Alvarez contends that these words were used to describe her weakened condition during the previous winter. It is urged that, due to the severity of Mrs. Alvarez's condition, neither the admitting physicians nor plaintiff were concerned with her symptoms during the preceding winter but, instead focused on her immediate problems. After considering the evidence and observing Mrs. Alvarez on the witness stand, the Court is persuaded that plaintiff did, in fact, suffer from weakness during the months preceding her paralysis. The Court is not persuaded, however, that this weakness was a smoldering, mild GBS as urged by plaintiff.

The exact chronology of events for the ten days prior to May 31, 1977, is also in dispute. The dates have importance because medical testimony of several expert witnesses was based on the exact chronology of medical events. It is plaintiff's testimony that she suffered with diarrhea from Wednesday evening, May 25 through Sunday morning, May 29. This was followed by nausea and vomiting on Sunday. By Sunday evening, Mrs. Alvarez testified that she was well enough to visit a cemetery. The next day, she attended a picnic at which she was energetic. That evening, she felt extremely tired and had severe leg pains. The next morning when she awoke she was unable to move any of her extremities and was taken to the hospital. At the time of trial, plaintiff had regained full use of her upper extremities but the paralysis in her lower extremities persists. She is mobile with the use of a walker or wheelchair. Her present condition is most likely to be permanent.

The medical history as it relates to the sequence of events taken by Dr. Porter upon plaintiff's admission and discharge from the hospital varies from plaintiff's testimony at trial. The medical history states that Mrs. Alvarez developed diarrhea on Sunday, May 22 rather than on May 25. It lasted for three or four days and was followed by two days of severe abdominal cramps with no apparent nausea or vomiting. The medical record further states, "on May 28, she felt rather good and went to the cemetery to decorate the graves and coming home she began to notice this weakness which had not been apparent before and which continued to increase until she was brought to the hospital." Jerry Crews, M.D., a neurologist consulted by Dr. Porter, indicated in his report of June 3, 1977 (Plaintiff's Exh. 2) that "Mrs. Alvarez was not feeling well for the six or seven days prior to the weekend; that over the weekend she felt well and resumed her normal activities; and that on Monday she went on an outing with her family and felt excessively tired, especially in the legs, when she returned home that evening."

As noted, various experts considered the precise time sequence of Mrs. Alvarez's diarrhea in rendering their opinions. Some of plaintiff's witnesses, who believed the diarrhea subsided on Sunday morning, testified that two days was too short a period for acute GBS to occur unless plaintiff's immune system had already been sensitized. Defendant's experts, who relied on the

medical history, testified that it is not uncommon for an acute case of GBS to occur within five or six days following a gastroenteritis attack. The Court is persuaded that the chronology of events relating to Mrs. Alvarez's diarrhea for the week preceding her paralysis is accurately reflected in the medical reports of Drs. Porter and Crews.

## IV.

### GUILLAIN–BARRE SYNDROME

At trial, the expert testimony focused on Guillain–Barre Syndrome. In addition, extensive medical literature pertaining to the disease was received in evidence and reviewed by the Court. One treatise in particular was central to the testimony, i. e., "Inflammatory Polyradiculoneuropathies" by Barry Arnason, M.D., found in *Peripheral Neuropathy*, Chapter 56, Dyck, *et al.*, page 1110 (1975). The Arnason article is a widely cited work in the field.

### A.

Guillain–Barre Syndrome is a neurologic disorder, inflammatory in nature, which affects the peripheral, as opposed to the central nervous system. The syndrome characterizes a set of neurologic symptoms rather than defining a specific organic disorder. The disease was first described in 1859 by Dr. Landry. It was again described in 1916 by Drs. Guillain, Barre and Stohl.[10] To date, medical science has not established the syndrome's exact etiology or cause.

From the evidence we find that GBS generally has these characteristics:

1. It is a neurologic disorder which effects the peripheral nervous system and nerve roots;

2. the primary clinical symptoms are symmetrical motor weakness and reflex impairment;

3. sensory impairment is typically negligible;

4. the primary laboratory symptoms are elevated protein levels in the cerebrospinal fluid and decreased nerve conduction rates; and

5. the disease usually peaks within one month of onset followed by recovery without permanent motor malfunction.

The NINCDS[11] *ad hoc* committee has advanced criteria for the diagnosis of GBS. *See, Annals of Neurology*, Vol. 3, No. 6, June 1978. The features which allow a diagnosis of GBS include clinical, laboratory and electrodiagnostic criteria. The committee stresses that diagnosis of GBS should be made independent of the existence of a recognized precedent event.

Features required for diagnosis of GBS within the NINCDS guidelines are progressive motor weakness of more than one limb and areflexia (loss of tendon jerk). Universal areflexia is the rule, though distal areflexia with weakening of the reflexes in the biceps and knees will suffice if other features are consistent. Clinical features which the committee lists as strongly supportive of the diagnosis (ranked in order of importance) are:

(1) Progression. Symptoms and signs of motor weakness develop rapidly but cease to progress by four weeks into the illness;

(2) relative symmetry. Symmetry is seldom absolute, but usually, if one limb is affected, the opposite is as well;

(3) mild sensory symptoms;

(4) bilateral facial weakness which indicates cranial nerve involvement; and

---

10. Other common designations for this disease include idiopathic polyneuritis, acute febrile polyneuritis, infective polyneuritis, postinfectious polyneuritis, acute toxic polyneuritis, acute polyneuritis with facial diplegia, acute infectious neuronitis, polyneuronitis, mononeuronitis, radiculoneuritis, polyradiculoneuritis, myeloradiculoneuritis, Guillain–Barre–Stohl Syndrome, Landry–Guillain–Barre–Stohl Syndrome. *See,*

Dyck, *et al.*, at 1110. This list is provided to illustrate the history of confusion in the medical and scientific professions concerning this disease.

11. NINCDS is the acronym for National Institute of Neurological Communicative Disorders and Stroke.

(5) recovery usually begins two to four weeks after progression stops. Most patients recover functionally.

Features which rule out a diagnosis of GBS according to the NINCDS committee include assymmetry of weakness, persistent bladder or bowel dysfunction and the occurrence of a purely sensory syndrome.

Various definitions of GBS are listed in the medical dictionaries: *Dorland's Illustrated Medical Dictionary*, 24th Ed. (1965) defines GBS as:

> A syndrome described as encephalitis of virus origin consisting of absence of fever, pain or tenderness in the muscles, motor weakness, abolition of tendon reflexes, and great increase of protein in the cerebrospinal fluid without increase in cells.

*The Attorney's Dictionary of Medicine*, Schmidt (1978) defines it as:

> A neurological disorder of unknown cause due to a virus, sensitivity to a virus, or to a perverse immunological reaction of the body to constituents of certain vaccines, resulting in allergic neuritis (inflammation of nerves) and the destruction of myelin (a fatty substance covering some nerve fibers).

### B.

While the exact cause of GBS is unknown, the disease has been associated with numerous antecedent events. Of these, the most common mentioned is a viral infection, either respiratory or gastroenteric. Other recognized antecedent events temporally associated include bacterial infections, surgery, fever treatment, malignant diseases and vaccines.[12] It must be emphasized that in approximately fifty percent of the cases there is no identifiable antecedent event. Dyck, *et al.*, at 1114.

The interval between the prodromal infectious episode and the onset of symptoms is variable; most frequently it is one to three weeks.[13] On occasion, the interval between the infection and the onset of GBS may be less than one week. Typically, those cases are the most acute. It should be pointed out that the infectious illness has usually subsided by the time the neuropathic symptoms surface. *Id.*, at 1110.

Medical science has not yet developed a biochemical test capable of determining the organic cause, if any, of GBS. Therefore, causal connection can only be established based on inferences drawn from reported clinical observations.

### C.

GBS is most often diagnosed clinically rather than in the laboratory. However, the most common laboratory evidence is elevated protein in the cerebrospinal fluid. In most cases, during the first few days of illness, total protein levels are normal; in fact, a raised protein level during this period is exceptional. After several days of illness, the protein value in the cerebrospinal fluid begins to rise and, even while the clinical conditions stabilize, the protein level continues to increase. Peak protein values occur four to six weeks after the onset of clinical symptoms. *Id.*, at 1123. Mrs. Alvarez's protein level, tested within a few days after admission to the hospital, was normal. The government asserts that this negates plaintiff's contention that she was suffering from a smoldering GBS.[14]

Another commonly utilized test is the electromyography which measures the rate

---

12. At the time Dr. Arnason's chapter in Dyck, *et al.*, was written GBS was associated with the rabies vaccine. In those cases, neurological symptoms seldom occurred earlier than ten days after the first inoculation and frequently, symptoms were manifested between ten and thirty days after the beginning of treatment. The cases of rabies vaccination–induced GBS with the shortest incubation period tended to be the most severe.

13. In some quarters, it is now generally accepted that the onset of the symptoms may occur up to ten weeks after the associated antecedent event. Center for Disease Control, *Guillain–Barre Syndrome Following Vaccination In The National Influenza Immunization Program*, American Journal of Epidemiology, Vol. 110, No. 2, 1979. The CDC study is discussed below.

14. Discussed in greater length below.

of nerve impulse conduction. In most cases, nerve impulse conduction is either completely impaired or severely limited across the demyelinated area. *Id.*, at 1128.

### D.

The most significant clinical features of GBS are progressive bilateral,[15] motor weakness and areflexia. *See*, NINCDS Criteria, *supra*. The severity of weakness covers a wide spectrum from mild ataxia (failure of muscle coordination) to total paralysis of every motor and cranial nerve. In most instances, the weakness is first noticed in the legs and gradually ascends through the body. Rarely are there solely sensory symptoms in the absence of motor debility. Tendon reflexes are usually abolished in affected areas although a flicker of activity may remain in mild cases. Dyck, *et al.*, 1121–1123. Mrs. Alvarez's reflexes were tested the day after she was hospitalized. She had no reflex response in her lower extremities, and reflexes could be obtained in only two muscles in her upper extremities. *See*, Deposition of Jerry Crews, M.D.

Other clinical symptoms include facial diplegia, impaired swallowing and chewing, and respiratory difficulties.

The onset of symptoms is typically subacute. Evolution of the syndrome is complete after two weeks in over fifty percent of the cases; after three weeks in eighty percent; and after four weeks in ninety percent. In other words, the disease peaks within one month of onset in a vast majority of the episodes. A stable period of brief duration precedes the recovery phase that usually advances to completion within a period of weeks to a few months.[16] Satisfactory recovery occurs by the end of four to six months in eighty-five percent of the cases, although some patients show permanent deficits of varying severity. Dyck, *et al.*, at 1121.

### E.

There are at least two distinct mechanical ways in which an antecedent event could cause GBS. The disease could be the direct consequence of a viral invasion of the peripheral nerves, or the viruses might act indirectly to trigger an immunologic response to the nerve in the host. The host immune response would then trigger the disease secondarily. The latter method was supported most often by the experts who testified. *See*, Testimony of Martin Lewis, M.D.; Dyck, *et al.*, at 1111. Stated differently, the immune system, which is designed to protect the body against antigenic stimuli, becomes misdirected and attacks the nervous system instead of attacking the virus, or other antigen which has invaded the system. This results in the destruction of the myelin sheath surrounding certain nerve fibers which in turn produces improper nerve conduction. The consequent effect is sensory disorder, motor weakness or paralysis. *See*, Testimony of Dr. Lewis. Dr. Arnason supports this indirect theory because he finds it difficult to envisage so many different viral agents,[17] each with its unique clinical features, producing an identical clinical syndrome and an identical pathologic picture in the nervous system by a directly invasive mechanism.[18] Dr. Arnason testified at trial that the most plausible mechanism by which an antecedent infection may initiate an acute inflammatory polyradiculoneuropathy is by acting as an adjuvant to increase markedly a low level sensitivity to pre-existing nerve impairment. This mechanism is also the theory advanced by Dr. Lewis to support plaintiff's contention that the swine flu vaccination sensitized Mrs. Alvarez's immune system, which then reacted improperly to the gastroenteritis. In his view, this chain of events caused plaintiff's GBS.

---

**15.** A symmetrical pattern is prevalent in classic GBS although it is not absolute. *See*, Dyck, *et al.*, at 1121.

**16.** One group has mentioned a recovery period of six to thirty-six months. Peterson, Daly, Dion, *et al.*, *Infectious Neuritis (Guillain Barre Syndrome) in Children*, Neurology 9:533 (1959).

**17.** In addition to the antecedent events associated with GBS noted in section IIIA, *supra*, Dr. Arnason recognizes at least fourteen other distinct types of viruses as being related to GBS. Dyck, *et al.*, Table 56–1 p. 1111.

**18.** *Id.*, at page 1111.

## V.

### EXPERT MEDICAL TESTIMONY

The medical disciplines involved in this litigation include neurology, virology, immunology, pathology and epidemiology.

At trial, expert medical testimony of nationally and locally prominent neurologists, epidemiologists and pathologists was presented. The Court found their testimony and the medical literature [19] on which they relied to be informative. We now discuss the salient features of their testimony, highlighting in particular those opinions and articles which advance the respective theories of causation.

The following doctors testified:

Charles Poser, M.D., Professor of Neurology, University of Vermont;

Martin Lewis, M.D., Professor and Chairman, Department of Immunopathology, Georgetown University;

Robert Porter, M.D., Internal Medicine, Greeley, Colorado;

Sidney Duman, M.D., Neurologist, Denver, Colorado;

Peter Quintero, M.D., Neurologist, Denver, Colorado;

James Austin, M.D., Professor and Chairman, Department of Neurology, University of Colorado Medical Center;

Stuart Schneck, M.D., Professor of Neurology and Neuropathy, University of Colorado Medical Center;

Lawrence Schonberger, M.D., Epidemiologist, Center for Disease Control, Atlanta, Georgia; and

Barry Arnason, M.D., Professor and Chairman, Department of Neurology, University of Chicago Medical School. Dr. Arnason is the author of two chapters in *Peripheral Neuropathy*, Dyck, *et al.*, 1975.

Other testimony was presented by deposition.

### A.

In support of plaintiff's allegation of causation, several doctors rendered their medical opinions and analyses. Essentially, their theories can be categorized into three basic positions. First, the swine flu vaccine sensitized Mrs. Alvarez's immune system to the possibility of GBS which was triggered by the gastroenteritis in late May, 1977. Second, the swine flu vaccine created a serum sickness–like reaction which began two to three weeks after inoculation and continued until the diarrhea episode triggered the GBS. Third, the plaintiff experienced chronic or smoldering GBS for six months beginning two to three weeks after vaccination which was exacerbated by the gastroenteritis.

That plaintiff's experts cannot agree on one approach to the medical evidence does not preclude this Court from accepting one of those theories. We are dealing with a constantly evolving, uncertain medical science. While plaintiff's theories diverge at certain points, there is a common thread among them, *i. e.*, the swine flu vaccination produced a malfunction in the immune system which caused it to react improperly to the gastroenteritis.

### B.

Plaintiff's first theory of causation, *i. e.*, that the swine flu vaccine sensitized Mrs. Alvarez's immune system to the possibility of GBS, was advanced by Drs. Lewis, Duman and Quintero. The thrust of their

19. In addition to the medical literature introduced in evidence, our research reflects several law review articles dealing with the effect of tort law on mass immunization programs. Baynes, *Liability For Vaccine Related Injuries: Public Health Considerations and Some Reflections on the Swine Flu Experience*, 21 Saint Louis University Law Journal 44 (1977); Franklin and Mais, *Tort Law and Mass Immunization Programs: Lessons From the Polio and Flu Episode*, 65 California Law Review 754 (1977); *see also*, Fielding, *Managing Public Health Risks: The Swine Flu Immunization Program Revisited*, 4 American Journal of Law and Medicine 35 (1978); Shapo, *Swine Flu and Legal Policy*, 63 American Bar Assn. Journal 51 (1977); and Wecht, *Swine Flu Immunization Program: Scientific Venture or Political Folly*, 3 American Journal of Law and Medicine 425 (1977); Neustadt and Fineberg, *The Swine Flu Affair*, published by the United States Department of Health, Education and Welfare, 1978.

testimony is that Mrs. Alvarez's immune system was sensitized by the vaccination and that the diarrhea she experienced was the trigger for the previously sensitized system. Each opined that had the immune system not been sensitized, the acute GBS suffered by plaintiff would not have occurred.

Dr. Lewis testified that the immune system is designed to give the body protection against infectious disease and attacks from the outside, but that in a number of diseases, including GBS, the immune system attacks the host instead of the enemy. He stated that the most likely explanation for Mrs. Alvarez's condition was that the diarrhea acted as an anamnestic agent that triggered the already sensitized immune system to react improperly. Plaintiff asserts that Dr. Arnason's chapter, *Inflammatory Polyradiculoneuropathies*, Dyck, *et al.*, page 1110, supports the view of Dr. Lewis. While Dr. Arnason agreed that GBS is an autoimmune disorder, he stated that in plaintiff's case, the swine flu vaccination was not the proximate cause of her GBS. Additional comments on Dr. Arnason's testimony follow below.

Dr. Lewis eliminated the possibility that the diarrhea four and one-half days before the onset of plaintiff's paralysis could have been the sole cause of her condition because the time interval was too short for the immune system to be primed *de novo*. In his opinion, it typically takes two to three weeks for the immune system to respond to a given stimulus, and ten days would be the shortest period acceptable unless the individual had previously encountered that experience and the immune system was sensitized such that when the second exposure occurred, the response was accelerated. The gastroenteritis was the secondary response. In reviewing plaintiff's medical history, Dr. Lewis identified the swine flu vaccination as the incident nearest in time to the diarrhea which is known to cause an immunologic response. Therefore, he concludes that the vaccine is the primary sensitizing agent.

Plaintiff analogizes Dr. Lewis' theory to the situations of recurrent GBS described in the medical literature. Plaintiff's Exhibit 21 is an article by Seyal, *et al.*, entitled *Recurrent GBS Following Influenza Vaccine*, Neurology 28:725–26, July 1978. That study describes the rapid onset of GBS after swine flu inoculation in two patients who had previously recovered from GBS. The authors state, at p. 726, "In the initial attacks, [the subjects of the study] had delays of two to three weeks from a viral infection to the onset of neurologic symptoms. Both recovered, after which recurrent GBS began four to seven days after influenza vaccination." It is further stated that an explanation of the rapid onset would be that in "some patients an attack of GBS leaves a permanent alteration in the immunologic state so that diverse later challenges (*e. g.*, the influenza vaccine) induce recurrence with a shorter latent period." *Id.* Plaintiff contends that this study supports Dr. Lewis' sensitization theory. On careful scrutiny of Dr. Seyal's report, the Court is not so persuaded. The patients studied by Dr. Seyal's group both had completely recovered from bouts with GBS *before* being inoculated. Plaintiff has never asserted that she has recovered from GBS. On the contrary, she claims to be suffering from GBS which began two to three weeks after receiving the vaccination and which continued until May, 1977 at which time it was exacerbated. Furthermore, unlike Mrs. Alvarez, the patients studied by Dr. Seyal contracted mild, mostly sensory GBS following the swine flu vaccination from which they substantially recovered. Finally, Dr. Seyal concludes that "these cases suggest the need for caution in vaccinating patients with a prior history of GBS." *Id.* It is apparent that the focus of Dr. Seyal's inquiry was the effect of swine flu inoculation on patients with a history of GBS rather than whether the swine flue vaccination could sensitize a previously unsensitized immune system to the possibility of GBS.

Dr. Lewis testified that GBS can have a prolonged progression. In support of that position he relied on an article entitled *GBS*

*With Slow Progressive Onset and Persist-ent Elevation of Spinal Fluid Protein* by Drs. Hinman and Magee reported in the Annals of Internal Medicine, Vol. 67, Nov. 1967, p. 1007, (Plaintiff's Exh. 25). In the four cases studied in the article, the syndrome was one of slow progression, evolving over a period of many months; in no case did a triggering event occur which exacerbated the syndrome into an acute phase with symptoms approaching paralysis. Furthermore, no etiologic agent was associated with the neuropathy in any of the four cases. In all four cases, the patients were young (ages ranged from 10–28) and substantially recovered. Also, an elevated cerebrospinal fluid protein was evident throughout; in two of the cases, the fluid protein content remained elevated for several years. *Id.,* at pp. 1011–12. This study tends to militate against the contention by Mrs. Alvarez that she suffered from a mild GBS during the winter of 1976–77 since her cerebrospinal fluid protein level was normal when tested in June, 1977. Dr. Lewis stated that he did not regard elevated cerebrospinal fluid protein to be a vital criteria in GBS. Dr. Poser also ascribes to this view. Dr. Lewis referred to other articles in the medical literature to demonstrate that GBS does not have to occur with a sudden onset, but that there could be a smoldering one that requires a good deal of searching to find the signs and symptoms that may have been there longer than anticipated. No case was alluded to by Dr. Lewis in which the GBS smoldered and then exploded into a very acute variety of the syndrome. In most of the gradual onset cases relied on by Dr. Lewis, the patient either had GBS, recovered, and then suffered GBS again, or the patient had diagnosed symptoms of GBS, *i. e.,* motor weakness or loss of tendon reflexes over a relatively lengthy period with eventual recovery.

Dr. Lewis testified that the weakness suffered by Mrs. Alvarez two to three weeks after the swine flu vaccination was evidence that the immune system had become misdirected. He does not believe that the joint pains were symptomatic of arthritis.

### C.

Plaintiff's second theory of causation advanced by Sidney Duman, M.D., is that the swine flu vaccine caused a serum sickness–like reaction which began two to three weeks after vaccination and continued until the gastroenteritis triggered the GBS. Essentially, this theory is similar to Dr. Lewis' in that it postulates that the vaccine created an improper immune response which made Mrs. Alvarez more susceptible to GBS.

In Dr. Duman's view, the GBS was not manifested until Mrs. Alvarez became paralyzed in May, 1977. The operative fact in Dr. Duman's opinion is the rapid onset of the paralysis. To him, this indicates a previously sensitized immune system.

The serum sickness–like reaction as related by Dr. Duman is not the classic serum sickness. According to testimony by Dr. Austin, the latter is characterized by hives, diarrhea and general malaise. It usually lasts no longer than one month.

Plaintiff on this point contends that chapter 55 in Dyck, *et al.,* authored by Dr. Arnason and entitled *Neuropathy of Serum Sickness,* supports Dr. Duman's theory. (Plaintiff's Exh. 29). Dr. Arnason recognizes that a serum sickness–like syndrome and its neurologic complications are still encountered with some drug therapy. *Id.,* at 1104. When the peripheral nerves are clinically involved in serum sickness, systemic manifestations such as fever, albuminuria (indicative of kidney disease), inflammation of the skin with or without hives, swelling and pain around the joints, crampy abdominal pains and diarrhea are often present. Most often these symptoms precede neurologic disorders by a day or two. Such neurologic symptoms should appear within seven to ten days after the serum injection. *Id.,* at 1105–06. With the exception of joint pains (which can be attributed to arthritis), plaintiff experienced none of the symptoms listed above within the recognizable time frame. We are not persuaded that plaintiff contracted some serum sick-

ness–like disorder or that such was the proximate cause of plaintiff's GBS.

### D.

Plaintiff's third theory of causation is that Mrs. Alvarez suffered a chronic or smoldering GBS for six months beginning two to three weeks after being vaccinated which was exacerbated by the episode of diarrhea. This theory was advanced primarily by Dr. Poser and was supported to some extent by Drs. Lewis and Quintero. Dr. Poser testified that there is unequivocal evidence that Mrs. Alvarez's illness was caused by the swine flu vaccination. It is his opinion that plaintiff was suffering from a mild, smoldering GBS beginning three weeks after inoculation which was triggered into its more acute phase by the gastroenteritis. In reaching his conclusion, Dr. Poser relied primarily on two facts. First, Mrs. Alvarez's inability to kneel, which indicates weakness of the proximal muscles; and second, the short interval between the diarrhea and the onset of neurologic illness, which indicates that there was a pre–existing sensitization. On cross examination, Dr. Poser indicated that he might reconsider his opinion if Mrs. Alvarez had experienced symptoms before being vaccinated similar to those she described after the inoculation.

Dr. Poser alluded to various articles in the medical literature to support his opinion. Those articles primarily recognize a chronic form of GBS. He referred to Dr. Arnason's chapter on *Inflammatory Polyradiculoneuropathies*, Dyck, *et al.*, p. 1135, where the author states:

> With the increasing use of electromyography to measure nerve conduction velocities, the presence of a considerable reservoir of mild indolent chronic neuropathy with symptoms insufficient to compromise the usual tasks of daily living has become increasingly evident. I suspect that many such cases are mild forms of polyradiculoneuropathy and that the clinical spectrum of the disease may be considerably broader than formerly thought.

The author further states that in his view the majority of slowly progressing sporadic cases of chronic neuropathy represent variants of acute polyradiculoneuropathy, but that this view is by no means universally held. *Id.*

Plaintiff contends that she experienced the chronic form of polyradiculoneuropathy described by Dr. Arnason in the treatise:

> Most often chronic hypertrophic neuropathy begins insidiously and progresses for months or years (Nattrass 1921). The illness may begin as mild distal weakness and progress at a slow tempo to quadriparesis. Alternatively it may progress for a time, become arrested or improve for an interval, and then resume its progressive course. Motor signs predominate at all times.

Dyck, *et al.*, at 1135.

The author further indicates that in chronic GBS, spinal fluid protein levels are generally elevated to some extent. *Id.* As previously noted, Mrs. Alvarez's spinal fluid protein level was normal in June, 1977, thus casting doubt upon the assertion that she was suffering from a chronic polyradiculoneuropathy. Additionally, Dr. Arnason in his live testimony does not endorse any theory respecting a nexus between the vaccination and GBS in plaintiff's case, or a diagnosis of chronic GBS. We are inclined to accept the live testimony of the author on this point in lieu of Dr. Poser's interpretation of Dr. Arnason's chapter.

Plaintiff alerts the Court to chapter 56 of *Peripheral Neuropathy*, where Dr. Arnason suggests "that a subclinical disease smolders on in a significant portion of recovered cases. It is probable, therefore, that clinical recurrences represent flareups of an indolent, clinically silent process." *Id.* In our view, Dr. Arnason is referring to patients who have previously been clinically diagnosed as having GBS and then recovered, only to suffer GBS again. This is not plaintiff's situation. She was not diagnosed as having GBS in the winter of 1976, nor did she recover from that or any other illness which she was suffering.

Plaintiff's Exhibit 26 is an article entitled *Chronic Relapsing Polyneuritis*, Journal of Neurological Sciences, 27:427 (1976) by Prineas and Mcleod. The article analyzes twenty–three GBS patients with a relapsing or remitting course of GBS or with a subacute onset and eventual improvement. Of the twenty–three patients, seventeen had at least one relapse. The primary thrust of the article is that chronic *relapsing* polyneuritis differs from acute idiopathic polyneuritis chiefly in regard to the evolution and the severity of the initial episode of the polyneuropathy. No reference is made to any case of a mild, smoldering GBS, requiring no medical attention, which is suddenly triggered into an acute phase. In each case described, obvious and clearly identifiable neurologic signs were present during the chronic period. The symptoms in each case were severe enough to require the patients to seek medical attention and were distinct from other medical difficulties the patients had previously experienced.

Plaintiff next refers the Court to an article by Drs. Torvick and Lundar, *A Case of Chronic Demyelinating Polyneuropathy Resembling the Guillain–Barre Syndrome*, Journal of Neurological Sciences 1977, 32:45–52 (Plaintiff's Exh. 27), to support the contention that she contracted chronic GBS. The patient in that study, two weeks after a minor respiratory infection, developed diplopia, weakness, paresthesia and decreased sensation in the distal parts of all four limbs. All of his symptoms progressed steadily. He was admitted to the hospital six weeks after the onset of symptoms with left side paresis, reduced sensation in all four limbs and decreased tendon reflexes. The patient demonstrated an increased spinal fluid protein level throughout his hospitalization. The paresis and sensory loss continued over the course of hospitalization and progressed to involve the proximal parts of the limbs and the trunk. During the last weeks, the patient was only able to move his shoulders slightly; otherwise, his limbs were completely paralyzed. The patient died from respiratory insufficiency seven months after the onset of neurologic symptoms.

We do not find the situation described by Torvick and Lundar analogous to the present case. Unlike Mrs. Alvarez, the patient under observation had been diagnosed as having GBS within six weeks after the onset of neurologic disorders. The syndrome then gradually, rather than rapidly progressed, which is the more typical course of GBS. This article illustrates the common thread permeating plaintiff's exhibits, *i. e.*, that GBS, once clinically manifested, can progress over a period of many months or even years before it stabilizes. The literature mentions no case in which a person complained of general weakness or debility for seven months and then experienced acute neurologic disorders resulting in paralysis.

### E.

In support of the government's position, various experts testified that, based on the epidemiologic data and Mrs. Alvarez's medical history, there was no causal connection between the swine flu vaccination and plaintiff's GBS. It is essentially defendant's position that the symptoms complained of by Mrs. Alvarez beginning two to three weeks after inoculation and continuing until the onset of paralysis in May, 1977, were related to her arthritis and were not neurologic in nature. The government contends that the gastrointestinal virus she suffered in late May, 1977 was the likely cause of her GBS.

Dr. Arnason, whose work in the field of polyneuropathies has been noted, testified that the cause of GBS is unknown. This statement is undisputed. It is his opinion, and also the opinion of Dr. Lewis, that the precedent event to an onset of GBS does not directly cause the disease, but instead, creates a perverse immune response which results in the destruction of the myelin sheath surrounding certain nerves.

In Dr. Arnason's experience, he has found upper respiratory and gastrointestinal infections to be the two most common antecedent events associated with GBS. Where such an infection is the precipitant, neuro-

logic symptoms usually appear within five or six days to two or three weeks. Dr. Arnason opined that plaintiff suffered a typical acute GBS caused by the diarrhea she experienced the week before her paralysis. The primary reasons for his conclusion are the time intervals. In Dr. Arnason's opinion, the outside limit between a related precipitant and the onset of symptoms is six or seven weeks. He does, however, recognize the validity of the Center for Disease Control study (discussed below) which extended the accepted period to ten weeks. Additionally, he testified that where there is a short interval between the onset of symptoms and the antecedent event, an acute GBS is common.

On cross examination, Dr. Arnason recognized that a subclinical form of GBS can exist which can be exacerbated by a secondary stimulus. However, the fact that plaintiff had weakness in her legs did not alter Dr. Arnason's opinion that she was not suffering from a mild GBS two to three weeks after the swine flu injection. If she had been suffering from mild GBS, neurologic symptoms would have been apparent sometime between October 28, 1976 and May 31, 1977. He also stated that the spinal fluid protein would have been elevated by June, 1977. It was his further belief that the swine flu vaccine did not make plaintiff's immune system more susceptible to GBS seven months later. In his opinion, the inoculation could not permanently affect a person's immune system.

James Austin, M.D., testified that there is no foundation in the medical literature to support a smoldering, subclinical GBS. He does not believe that Mrs. Alvarez suffered any neurologic disorder until late May, 1977. He attributes her weakened condition to the general ill state of her health.

Dr. Austin opined that plaintiff did not suffer from recurrent GBS. He defined recurrent GBS by the following example: "If a person repeatedly had a polyneuropathy with the classical GBS symptoms two weeks after every viral infection that person suffered, then this would be recurrent GBS." In the recurrent GBS cases reviewed by Dr. Austin, the patients did not experience the acute elements Mrs. Alvarez has, nor were they generally associated with a known or obvious precipitating event. He further expressed the view that the swine flu vaccination was not the proximate cause of plaintiff's illness. In formulating his opinion, Dr. Austin was not aware of Mrs. Alvarez's condition or activities during the summer of 1976. He indicated that those activities would be significant although they did not change his opinion. He was aware, however, of plaintiff's general weakness two to three weeks after the swine flu injection but could not distinguish those symptoms from prior ailments. The pivotal factor in Dr. Austin's diagnosis was the seven month interval between inoculation and onset of neurologic symptoms. He believes that after ten weeks, something other than the swine flu vaccination must be the cause of GBS. In Dr. Austin's review of the laboratory models and medical literature, he has found no evidence of a human case, and no animal case [20] in which symptoms appear beyond four months of an assault on the immune system. The diarrhea was, in Dr. Austin's opinion, the most likely cause of plaintiff's GBS.

Dr. Austin further testified that it was possible, although not plausible, that the swine flu vaccine and the gastroenteritis jointly caused Mrs. Alvarez's illness. He does not recognize any cross sensitivity between these two precipitants; such a cross—sensitivity is a necessary prerequisite to any interaction between a sensitizing stimulus and a triggering event.

While Dr. Austin agreed that the paralysis occurred abruptly, he also stated that many cases of GBS have onsets occurring over a period of a few days. Additionally, he also indicated that the quick onset might be evidence of a previously sensitized immune system, but that this was not his

---

**20.** Researchers have developed a condition in animals resembling GBS which is produced by injecting into the animal an emulsion of peripheral nerves to which they have been sensitized. This animal model is called Experimental Allergic Neuritis. (*See*, Testimony of Dr. Austin)

medical assessment of the instant case. As previously mentioned, where the onset of symptoms closely follows the precipitant, the GBS is typically acute.

Stuart Schneck, M.D., further advanced the government's position that there was no causal connection between the swine flu inoculation and plaintiff's illness. The benchmarks of Dr. Schneck's opinion were the gastroenteritis, which he considered to be an established precipitant, and the long interval between the inoculation and the onset of neurologic symptoms. He described Mrs. Alvarez's situation as a typical case of acute onset.

Dr. Schneck also testified that he does not recognize a smoldering subclinical GBS, although he does accept a chronic form of the disease. In his view, a person cannot have GBS without its attendant symptoms.

In formulating his opinion as to the issue of causation, Dr. Schneck did not conduct a physical examination of Mrs. Alvarez or speak with her. He did, however, review a complete set of her medical records. Dr. Schneck was unaware of plaintiff's activities between her hospitalization in April, 1976 and the date she received the swine flu vaccination. When informed that Mrs. Alvarez had planted a garden, painted her kitchen and laid tiles on her bathroom floor, Dr. Schneck's opinion remained unaltered. He testified that arthritis is a variable disease and that in his opinion, the weakness experienced by plaintiff during the winter of 1976–77 was attributable to her arthritis notwithstanding her freedom from that disease during the summer.

An article entitled *Guillain–Barre Syndrome, A 42–Year Epidemiologic and Clinical Study*, by Kennedy *et al.*, conducted at the Mayo Clinic, Rochester, Minn. (Exhibit BBB) supports defendant's theory that the diarrhea was the sole cause of plaintiff's GBS. In that study, of the twelve patients

reporting a preceding gastrointestinal illness, eleven occurred during the first week prior to the onset of neurologic symptoms (*See* p. 96, Table 1).

### F.

While various theories of causation have been advanced, all experts who testified agree that the exact cause of GBS is unknown. Therefore, we must consider epidemiologic studies to determine if the disease is causally related to an antecedent event. A principal study is reported in an article by Dr. Lawrence Schonberger, *et al.*, entitled *Guillain–Barre Syndrome Following Vaccination in the National Influenza Immunization Program, U.S. 1976–77*, American Journal of Epidemiology, Vol. 110, 105–122 (1979). It is the most extensive study ever undertaken to determine the incidence of GBS; one thousand ninety–eight cases of GBS were analyzed. The authors concluded that there was an etiologic relationship between the swine flu vaccine and GBS, but that such relationship extended for ten weeks at most. *Id.*, at 112 (figures 6 and 7). This study was frequently referred to by defendant's witnesses.

We comment on several phases of the study and on the trial testimony of Dr. Schonberger, its principal author.

When the Swine Flu Program began, it incorporated a surveillance system to evaluate possible adverse vaccine reactions. By December 15, 1976, preliminary data from Alabama, New Jersey, Minnesota and Colorado suggested that the incidence of GBS among vaccinees was approximately seven–fold greater than the incidence in the unvaccinated population.[21] In addition, case reports from these four states, and seven others in which active surveillance [22] for cases of GBS was begun, suggested an association between vaccination and the onset

---

21. Normally, GBS is expected to occur in nine to nineteen persons per million population per year in the United States. In other words, approximately three thousand people contract GBS annually.

22. In an active surveillance, the CDC searches for cases of a specific disease by either calling or surveying doctors or visiting hospitals to review records. In a passive surveillance, the Center sits back and waits for physicians and public health officials to report cases that might occur.

of GBS two to three weeks later. These apparent associations led to the suspension of the program on December 16, 1976 and to the expansion of the surveillance nationally.

Dr. Schonberger's paper presents an analysis of the data received by the CDC through March, 1978 on cases of GBS with onset between October 1, 1976 and January 31, 1977.[23] Of the one thousand ninety-eight reported GBS cases, five hundred thirty-two had received the swine flu vaccine prior to the onset of symptoms. No established criteria for GBS was utilized in reporting, but eighty percent of the reported cases were diagnosed by neurologists. The number of reported cases rose sharply between mid-October and mid-December, peaking the week ending December 18, 1976. A precipitous dropoff in reported cases was observed thereafter. In contrast to the sharply rising incidence of GBS observed in the vaccinated population, the number of unvaccinated cases each week from October 1 to December 18 was relatively stable. Even among the unvaccinated cases, there was a noticeable dropoff in reported cases of GBS after December 18, 1976. *Id.*, at 109. Plaintiff contends that the only explanation for the drop in reported cases is that the medical community, having seen that the program was suspended, relaxed in their reporting. Plaintiff's Post Trial Brief p. 19. We find some merit in plaintiff's position, but not sufficient to undermine the study. The data was collected by an active surveillance method which was not dependent upon the initiative of the medical community to report incidences of GBS. This type of surveillance is often utilized where researchers desire extensive data on a particular disease. The study found that by early December, the weekly attack rates[24] in the vaccinated population began to decrease sharply. By late January, 1977, it had returned to approximately the level of the unvaccinated population.

The study revealed that seventy-one percent of the vaccinated cases with known time intervals became ill within the first four weeks after vaccination. By two-day intervals between inoculation and onset of GBS, the largest percentage of the cases (ten percent) occurred on the sixteenth and seventeenth day following vaccination. After the tenth week, there was no significantly greater risk of contracting GBS in the vaccinated population. During the eleventh week and the thirteenth through the seventeenth weeks after vaccination the attack rate of GBS for the vaccinated population was .24 cases per million vaccinees. During the twelfth week, it was .34 cases per million. The expected attack rate among the unvaccinated population was .22 cases per million population per week. Statistically, the difference in attack rates is not significant. *Id.*, at 112. This led Dr. Schonberger to conclude that there is no relation between the swine flu vaccine and the onset of GBS more than ten weeks later.

The study also included a comparison of the cerebrospinal fluid protein level in the vaccinated and unvaccinated GBS patients. A significantly higher proportion of vaccinated cases (82.3%) than unvaccinated cases (74.7%) demonstrated an elevated protein level. *Id.*, at 116. The study also revealed that the unvaccinated patients had a significantly greater frequency of reported acute illness in the four weeks prior to onset, 61.8% as compared to 32.8% for the vaccinated population with onset of symptoms within ten weeks after inoculation. This suggests that the vaccine replaced acute illness as a trigger of GBS during that period. *Id.*, at 121. Dr. Schonberger testified that GBS patients with onset of symptoms more than ten weeks after vaccination reported an acute illness four weeks prior to

---

**23.** Dr. Schonberger testified that the surveillance only studied cases with onset prior to January 31, 1977 for two reasons. First, by that date, the rate of occurrence of GBS had returned to normal, and second, it was not cost effective to study cases with onset after that date.

**24.** The attack rate is a fraction whose numerator is the number of cases of GBS in the population and whose denominator is the population.

onset in sixty–eight percent of the cases. This similarity to the percentage of unvaccinated GBS patients reporting prior illness further supports defendant's contention that there is no causal relation between inoculation and GBS more than ten weeks later; the vaccine no longer replaced acute illness as a trigger.

While plaintiff agrees that the Schonberger study, and other epidemiologic studies as well, must be considered, she cautions that the importance and conclusiveness attributed to them must be limited. Plaintiff highlights two major alleged shortcomings in the Schonberger study. First, she contends that the study was designed to determine whether or not there was a causal relation between the swine flu vaccination and GBS; that it was not intended to establish any period within which such a causal connection could probably exist. Second, there was a limited number of people that Dr. Schonberger could possibly have data on past ten weeks; only individuals inoculated prior to November 15, 1976 could have contracted GBS more than ten weeks after vaccination.

We have considered and reject this analysis. While we are of the view that it would have been beneficial to study cases of GBS with onset after January 31, 1977, we do not believe this omission vitiates the importance of Dr. Schonberger's findings. The fact that the major purpose of the surveillance was not to establish a time limit for the causal connection between the swine flu injection and GBS is not determinative. As a necessary incidence of determining whether a causal connection exists, a temporal relation can be discerned. Here, information was available as to the dates of inoculation and onset of symptoms as well as medical histories of the patients. We also cannot agree with plaintiff's contention that the study is less valid because it only includes those vaccinated prior to November 15, 1976. Plaintiff's Exhibit 14 indicates that twenty-six million Americans received the vaccine between October 1 and November 15, 1976. This number of people is substantial.

We also note that the State of Michigan conducted a study (Defendant's Exhs. R, S and T) about which Dr. Schonberger testified. It confirms that the risk in the vaccinated population of contracting GBS did not rise above background levels after January 31, 1977. This study analyzes cases of GBS with onset between July 4, 1976 and June 4, 1977. It is the only study which examines data pertaining to patients with onset of GBS after January 31, 1977 who had previously received a swine flu vaccination. In Dr. Schonberger's opinion, the Michigan study indicates that there was an increased risk of contracting GBS in the vaccinated population in Michigan during November and December of 1976. After that time, the study reveals that there is no significant relation between the swine flu vaccine and GBS.

The data relied on for the Michigan study was collected by state health officials who reviewed hospital records and contacted neurologists and physical therapists. Dr. Schonberger testified that the data was collected in a manner comparable to that used in the CDC's initial study (Defendant's Exh. A–121). Based on the Michigan data, it was Dr. Schonberger's conclusion that after six weeks there was no greater risk of contracting GBS among those who had been vaccinated. He also testified that the study indicates that the swine flu vaccination did not sensitize people to develop GBS because there was no higher incidence of GBS among vaccinees after December 1976. To further support this proposition, Dr. Schonberger related the results of the CDC's routine surveillance analyzing the risk of GBS after influenza vaccinations [25] for the period 1978–79. Of the people who contracted GBS following inoculation in 1978–79 the percentage of those who received the swine flu vaccine in 1976 was significantly below what was statistically expected. In Dr. Schonberger's opinion, this indicates that the swine flu vaccine was not a sensitizing agent.

---

**25.** The influenza vaccine administered that season contained no swine flu antigens.

**1206**

## VI.

### THE LAW OF CAUSATION

Under the Federal Tort Claims Act, the United States is liable "for injury . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2674. In the instant action, the applicable law is that of the State of Colorado.

■ Under Colorado law, an event is the proximate cause of another's damage if in the natural and probable sequence of things, it produced the claimed injury. It is an event without which the injury would not have occurred. If more than one cause contributed to the alleged injury, then each cause may be considered a proximate cause. A proximate cause need not have been the only cause or the last or nearest cause. Such event is sufficient if it concurs with some other event, either in combination with it or separately, to cause the claimed injury. *Reaves v. Horton*, 33 Colo.App. 186, 518 P.2d 1380 (1973), *rev'd in part on other grounds*, 186 Colo. 149, 526 P.2d 304 (Colo. 1974); *Winkler v. American Safety Equipment Corp.*, 604 P.2d 693 (Colo.App.1979). *See also*, Colorado Jury Instruction at 9:26 and 9:28. In *Moore v. Standard Paint and Glass Co. of Pueblo*, 145 Colo. 151, 358 P.2d 33 (1969), the Colorado Supreme Court reiterated the "but for" test of causation initially adopted in *Denver v. Johnson*, 46 P. 621, 623 (Colo.App.1896). The rule was stated as follows:

"[W]here several concurring acts or conditions of things—one of them the wrongful act or omission of the defendant—produces the injury and it would not have been produced but for such act or omission, such wrongful act or omission is the proximate cause of the injury . . ."

358 P.2d at 36.

■ In the instant case, if plaintiff establishes that the swine flu vaccination made her more susceptible to contracting GBS in conjunction with an episode of diarrhea or that the vaccine singly caused the GBS, then the vaccination is the proximate cause of her condition. All that is necessary to establish a causal connection between the inoculation and plaintiff's illness is to show facts and circumstances as would indicate with a reasonable probability that the GBS resulted from, or was precipitated by, the swine flu inoculation. *Widefield Homes, Inc. v. Griego*, 160 Colo. 225, 416 P.2d 365 (1966); *Industrial Commission v. Royal Indemnity Co.*, 124 Colo. 210, 236 P.2d 293, 295 (1951); *O'Connor v. Boulder Colorado Sanitarium Assn.*, 111 P.2d 633, 634–35 (Colo.1941); *Ringsby Truck Lines v. Industrial Commission*, 491 P.2d 106, 30 Colo.App. 224 (1971). Mere conjecture or possibilities will not establish a probability. *O'Connor, supra*, at 635.

## VII.

### BURDEN OF PROOF

■ Plaintiff has the burden of proving by a preponderance of the evidence that the swine flu vaccine was the proximate cause of her paralysis. *Exchange National Bank of Colorado Springs v. Sparkman*, 191 Colo. 534, 554 P.2d 1090, 1092 (1976). While plaintiff presented the opinions of widely respected doctors, we are not persuaded that she has met her burden. The smoldering GBS theory propounded by Dr. Poser is not generally accepted in the present state of medical and scientific knowledge; nor is Mrs. Alvarez's condition comparable to any described cases of chronic neuropathy. Additionally, we do not attribute plaintiff's weakness during the winter of 1976–77 to any neurologic disorders. We believe it to be a result of Mrs. Alvarez's variable health problems. Similarly, Dr. Lewis' theory of an immunologic sensitization is speculative. On the other hand, the gastrointestinal infection which preceded Mrs. Alvarez's paralysis is an event commonly associated with GBS. Where, as here, there is no exact scientific proof of causation, we must consider such etiologic evidence as persuasive. Furthermore, this position has support in the testimony of Drs. Austin, Schneck and Arnason.

The epidemiologic evidence also supports the conclusion that the vaccine did not cause Mrs. Alvarez's illness. Prior to the study conducted by Dr. Schonberger, it was believed by the medical community that only events preceding the onset of neurologic symptoms by less than four weeks were associated with GBS. As a result of Dr. Schonberger's study, it has been suggested that the temporal relation can be ten weeks. In the instant case, we believe that seven months is too long an interval to connect causally the vaccine and plaintiff's GBS. This is especially true where a known antecedent event preceded plaintiff's illness by one week.

While there is a strong suggestion in the medical and scientific authorities that the maximum interval between a precedent medical event and the onset of neurologic symptoms of GBS is ten weeks, we do not draw such a definitive line. In view of constantly evolving patterns in this body of knowledge, we do not consider this ten week period a settled doctrine. We have undertaken instead to analyze and synthesize testimony and evidence which in our opinion reflects the present state of medical knowledge as it affects plaintiff, Jennie Alvarez. In the process, we strive to provide bases and precedents for other such cases. The parameter of ten weeks may be modified at some future time in the light of reason and experience.

As noted, medical and scientific knowledge pertaining to GBS is constantly emerging. An influx of studies and reports has surfaced with increasing frequency since 1976. Perhaps in the near future this interest will assist in isolating the exact cause of GBS. Until then, we will be constrained by the present state of knowledge to decide GBS cases on a case–by–case basis relying on epidemiologic and etiologic data for assistance in our fact finding responsibilities.

That differences of opinion exist as to whether there is a causal connection between the swine flu vaccine and the onset of GBS generally, or in this particular case, is apparent. The uncertain etiology of the disease has led the experts to propound varying theories of causation. At trial, respected neurologists rendered opinions to a reasonable degree of medical certainty that lead to contrary results. We have endeavored to determine those opinions which represent the more probable state of events and the relative weight to be given each.

## VIII.

## CONCLUSION

It is unfortunate that Mrs. Alvarez suffers from this enigmatic disorder. She has demonstrated throughout her lifetime attributes of hard work, frugality and family concern. However, the fact remains that only those illnesses which are proven to be causally related to the vaccine are compensable.

We find and conclude that plaintiff has failed to establish by a preponderance of the evidence that the GBS from which she suffers was caused by the immunization.

## ORDER

We find the issues joined in favor of defendant, United States of America, and against plaintiff, Jennie Alvarez. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and the complaint and action are dismissed. Each party to pay its or her own costs.

This Order constitutes the findings of fact and conclusions of law as required by the *Federal Rules of Civil Procedure*, Rule 52(a).

## APPENDIX

The following is a glossary of more frequently used medical terms in this opinion. Unless otherwise indicated, all definitions are from *Dorland's Illustrated Medical Dictionary*, 24th ed. 1965.

ACUTE–Sharp; poignant; having a short and relatively severe course.

ANTIBODY–A protective or defensive material found naturally in the body or produced by the body in response to the intro-

duction into its tissues of a foreign substance, especially if it is injurious. *Attorney's Dictionary of Medicine*, Schmidt (1978).

ANTIGEN–A substance upon which upon introduction into the blood stream or body tissue stimulates the formation of antibodies. Schmidt, *supra.*

AUTOIMMUNIZATION–The production in an organism of reactivity to its own tissue.

AXON–The central core which forms the essential conducting part of the nerve fiber.

CENTRAL NERVOUS SYSTEM–That portion of the nervous system pertaining to the brain and spinal cord.

CEREBROSPINAL FLUID–The fluid contained within the four ventricles of the brain and the central canal of the spinal cord.

DIPLOPIA–The perception of two images of a single object.

ELECTROMYOGRAPHY–The testing of the changes in the electric potential of muscle by recording the electrical activity in a muscle by stimulating its nerve.

EPIDEMIC–A situation where a disease attacks many people in the same region.

EPIDEMIOLOGY–The field of science dealing with the relationships of the various factors which determine the frequencies and distributions of infectious diseases.

ETIOLOGY–The study or theory of the causation of any disease.

GASTROENTERITIS–Inflammation of the stomach and intestines; it is typically associated with diarrhea.

IMMUNE–Being protected against a particular disease, as by inoculation.

IMMUNOLOGY–The part of biology which concerns itself with the study of the immune system.

MYELIN SHEATH–The fat–like substance which surrounds the axon of certain nerve fiber.

NEUROLOGY–That branch of medical science which deals with the nervous system, both normal and in disease.

OSTEOARTHRITIS–A chronic multiple degenerative joint disease, whereby the joints become inflamed.

PANDEMIC–A widespread epidemic.

PARESTHESIA–An abnormal sensation, such as burning, prickling, etc.

PATHOLOGY–That branch of medicine which deals with the essential nature of disease, especially of the functional changes in tissues and organs of the body which cause or are caused by disease.

PERIPHERAL NERVOUS SYSTEM–That part of the nervous system which begins where the nerves leave the spinal column; it extends throughout the body.

POLYRADICULONEUROPATHY–An acute, infectious inflammation which involves peripheral nerves, the spinal nerve roots and the spinal cord. GBS is a poly-radiculoneuropathy.

SENSITIZATION–The process in which an individual is exposed to a specific antigen which creates an immune response, i. e., subsequent exposure to that antigen creates a much stronger immune response; this is essentially the theory of immunization.

SERUM–Blood serum from animals that have been inoculated with bacteria or their toxins. Such serum when introduced into the body produces passive immunization by virtue of the antibodies it contains.

SUBACUTE–Somewhat acute, between acute and chronic.

SYNDROME–A set of symptoms which occur together; the sum of signs of any morbid state.

VACCINE–A suspension of killed or attenuated microorganisms administered for the prevention, amelioration, or treatment of infectious disease. A bivalent swine flu vaccine contained antibodies against both swine flu and A/Victoria flu whereas the monovalent vaccine was only designed to protect against swine flu.

VIROLOGY–The branch of microbiology which is concerned with viruses and viral diseases.

VIRUS–One of a group of infectious agents characterized by a lack of independent me-

tabolism and by the ability to replicate only within living host cells.